## UNITED STATES  DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**JUSTIN TAYLOR**                                          **CIVIL ACTION**

**versus**                                                **NO. 11-571**

**BURL CAIN**                                             **SECTION: "I" (3)**

## REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Justin Taylor, is a state prisoner incarcerated at the Louisiana State Penitentiary, Angola, Louisiana.  On March 23, 2006, he was convicted of second degree murder

under Louisiana law.[1]  On April 27, 2006, he was sentenced to a term of life imprisonment without benefit of parole, probation, or suspension of sentence.[2]  On November 27, 2007, the Louisiana Fifth Circuit Court of Appeal affirmed his conviction and sentence.[3]  The Louisiana Supreme Court then denied his related writ application on May 9, 2008.[4]

On or about May 11, 2009, petitioner filed an application for post-conviction relief with the state district court.[5]  That application was denied on September 24, 2009.[6]  He was likewise denied post-conviction relief by the Louisiana Fifth Circuit Court of Appeal on December 3, 2009,[7] and by the Louisiana Supreme Court on January 7, 2011.[8]

On February 15, 2011, petitioner filed the instant federal *habeas corpus* application. In support of that application, he asserts the following claims:

---

[1] State Rec., Vol. XIII of XVII, transcript of March 23, 2006, p. 222; State Rec., Vol. VII of XVII, minute entry dated March 23, 2006; State Rec., Vol. IV of XVII, jury verdict form.

[2] State Rec., Vol. XIII of XVII, transcript of April 27, 2006, p. 3; State Rec., Vol. IV of XVII, minute entry dated April 27, 2006.

[3] State v. Taylor, 973 So.2d 83 (La. App. 5th Cir. 2007) (No. 07-KA-93); State Rec., Vol. VII of XVII.

[4] State v. Taylor, 980 So.2d 688 (La. 2008) (No. 2007-K-2454); State Rec., Vol. VII of XVII.

[5] State Rec., Vol. VI of XVII.

[6] State Rec., Vol. VI of XVII, Order dated September 24, 2009.

[7] Taylor v. Cain, No. 09-KH-891 (La. App. 5th Cir. Dec. 3, 2009) (unpublished); State Rec., Vol. VI of XVII.

[8] State *ex rel.* Taylor v. State, 53 So.3d 469 (La. 2011) (No. 2010-KH-0149); State Rec., Vol. XVII of XVII.

1.      The trial court erred in denying the motion to recuse the
        judge;

2.      The trial court erred in admitting hearsay testimony;

3.      Petitioner was denied his right to appeal and judicial review;
        and

4.      Petitioner received ineffective assistance of counsel.[9]

The state concedes that petitioner's application is timely and that he has exhausted his state court remedies with respect to those claims.[10]

<u>Standards of Review</u>

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both.  The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." <u>Bell v. Cone</u>, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable

---

[9] Petitioner lists three separate ineffective assistance claims in his application.  The Court has consolidated those claims for ease of analysis.

[10] Rec. Doc. 9, pp. 2-3.

determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning."  Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases.  A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir.) (internal quotation marks, ellipses, brackets, and footnotes omitted), cert. denied, 131 S.Ct. 294 (2010).

Regarding the "unreasonable application" clause, the United States Supreme Court

has explained:

> [A] state-court decision can involve an "unreasonable application" of
> this Court's clearly established precedent in two ways.  First, a
> state-court decision involves an unreasonable application of this
> Court's precedent if the state court identifies the correct governing
> legal rule from this Court's cases but unreasonably applies it to the
> facts of the particular state prisoner's case.  Second, a state-court
> decision also involves an unreasonable application of this Court's
> precedent if the state court either unreasonably extends a legal
> principle from our precedent to a new context where it should not
> apply or unreasonably refuses to extend that principle to a new
> context where it should apply.

Williams v. Taylor, 529 U.S. 362, 407 (2000).  The Supreme Court has noted that the focus of this

inquiry "is on whether the state court's application of clearly established federal law is objectively

unreasonable, and we stressed in Williams that an unreasonable application is different from an

incorrect one."  Bell, 535 U.S. at 694; see also Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011)

("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application

of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").

While the AEDPA standards of review are strict and narrow, they are purposely so.

As the United States Supreme Court recently held:

> [E]ven a strong case for relief does not mean the state court's
> contrary conclusion was unreasonable.
>
> If this standard is difficult to meet, that is because it was
> meant to be.  As amended by AEDPA, § 2254(d) stops short of
> imposing a complete bar on federal court relitigation of claims
> already rejected in state proceedings.  It preserves authority to issue
> the writ in cases where there is *no possibility* fairminded jurists could
> disagree that the state court's decision conflicts with this Court's
> precedents.  It goes no farther.  Section 2254(d) reflects the view that
> habeas corpus is a guard against *extreme malfunctions* in the state

criminal justice systems, *not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

<u>Harrington v. Richter</u>, 131 S.Ct. 770, 786-87 (2011) (citations omitted; emphasis added).

<u>Facts</u>

On direct appeal, the Louisiana Fifth Circuit Court of Appeal summarized the facts of this case as follows:

Officer Keith Seals of the Kenner Police Department testified that on the night of December 26, 2001, he was on patrol when he responded to a shooting call at the Burger King Restaurant at 1000 West Esplanade. When he arrived at the scene, he saw a restaurant manager, Benny Randazzo, lying dead on the floor. Some restaurant employees were sitting in the dining area, and they appeared to be in shock.

Officer Seals interviewed employee Lenell Jackson. Ms. Jackson said she was standing behind the service counter when the shooting occurred. She described the gunman as 5 feet, 11 inches tall, wearing a gray, hooded sweatshirt and blue jeans. A black bandanna covered the lower part of his face. The other employees gave the officer similar descriptions. Ms. Jackson said that when the perpetrator entered the restaurant, he ordered that no one move, and he told the victim to open all of the cash registers.

Judy Jacobsen testified that at the time of the murder, she was the manager of the Burger King on West Esplanade. The victim, Mr. Randazzo, was an assistant manager, and he was also married to Jacobsen's sister. Jacobsen testified that she worked the day shift on the date of the murder and Randazzo ran the evening shift. Jacobsen remained at the restaurant for some time after her shift ended in order to balance the employees' cash register receipts and lock the money in the safe. During that time, Randazzo was working in the front of the restaurant.

Jacobsen testified that employee Eddie Jackson was working as a cashier that evening. When Jacobsen returned to the front of the

– 6 –

restaurant after counting receipts, she saw that Eddie's sister, a newly hired employee, was sitting at a table in the dining area. The young woman was eating a Whopper Jr. meal while she waited for Randazzo to assist her with some new hire paperwork. Jacobsen testified that there had been a major problem at the restaurant with employees serving food to people who had not paid for it. When Jacobsen saw that Eddie's sister did not have a sales receipt on her meal tray, she suspected the girl had not paid for the food. Jacobsen testified that she checked the recent cash register receipts, but did not find one for the sale of a Whopper Jr. meal. While Jacobsen was checking the registers for the sale, Eddie was working in the drive-through area. Jacobsen testified that she was pretty sure he knew what she was looking for, because it was common knowledge that anyone who gave out food without collecting payment for it could lose his or her job.

Jacobsen asked Randazzo to take Eddie and his sister aside and inform them that he was being fired and she would not be hired, and to tell them why. According to Jacobsen, Randazzo was short on staff, so he did not fire Eddie that night. At 7:00 p.m., Randazzo instructed Eddie to take a 30-minute break. When Jacobsen called Randazzo at 9:00 that night, he told her that he had not fired Eddie, and that Eddie had gone on break and failed to return. Neither Jacobsen nor Randazzo confronted Eddie that day about giving away food.

Jacobsen testified that police called her at 11:00 that night to inform her that Randazzo had been shot and killed at the restaurant. She was asked to inform her sister, Randazzo's wife, of his death. Jacobsen and her husband went to the restaurant with her sister and nephew. Jacobsen spoke to a detective, who asked her if there had been any incidents at the restaurant that might have provoked the shooting. She informed him of the incident involving Eddie Jackson.

Detective Michael Cunningham testified that he reported to the scene 15-20 minutes after the shooting. After conferring with Officer Seals, Cunningham sent four witnesses to the Kenner police complex, where he later interviewed them. Those witnesses were Burger King employees Jessica White, Ernest Brown, Donnie McCoy, and Lenell Jackson.[FN1] Detective Cunningham testified that the witnesses described the shooter as a black man. There were some discrepancies in the witnesses' descriptions, but all of them, except Donnie McCoy, said the perpetrator wore a gray, hooded sweatshirt. McCoy reported that he was cleaning the bathroom at the time of the shooting and did not see the perpetrator. The witnesses

also said the gunman wore a dark colored bandanna, and that his gun was a chrome-plated or silver revolver.

> [FN1]  Donnie McCoy and Lenell Jackson did not testify at trial.  Jerry Faulkner, an investigator for the State, testified at trial that he had tried unsuccessfully to serve them with subpoenas.

Cunningham also questioned Burger King employee David Reese, who left the restaurant on his bicycle minutes before the murder.  Reese told Cunningham he saw two men in the Burger King parking lot when he left the restaurant.  At first he named fellow employee Eddie Jackson as one of the men, but later said he was not sure if the man was Jackson.

Cunningham testified that Jacobsen informed him the victim was supposed to fire Eddie Jackson.  He learned that Eddie Jackson lived two doors down from Ernest Brown.  Based on that fact, the detective interviewed Brown a second time.  When Cunningham interviewed Brown a third time in late 2002, Brown was in jail on armed robbery charges unrelated to the murder.  Brown stated that defendant was the gunman in the murder, and that he recognized defendant by his voice.

Detective Cunningham also learned that Eddie Jackson is defendant Justin Taylor's nephew.  At the time of the murder, defendant lived one block away from Eddie.  On December 27, 2001, Cunningham interviewed Eddie, who was wearing a gray hooded sweatshirt and gray sweatpants.  Eddie told the detective that on the day of the murder, he walked to defendant's house shortly after 11:00 a.m.  At about 3:30 p.m., Eddie and defendant walked to Eddie's house.  They saw Ernest Brown along the way and talked to him.  Eddie then went home to change clothes, and he and his sister went to Burger King.  They left Burger King at 5:00 p.m.  Eddie went home and babysat for his little brother.  Then, at 8:00 p.m. he picked up defendant, and they went to an EZ Serve store, and then to a Popeye's restaurant at Williams Boulevard and West Esplanade.  After that, the two men went to defendant's house, where Eddie stayed until midnight.

Detective Cunningham testified that officers obtained a security videotape from an EZ Serve located a quarter of a mile from the Burger King.  Still photographs from that videotape were introduced as evidence and Cunningham identified them.  The detective testified that the photographs depicted defendant and Eddie

Jackson in the EZ Serve store 20 minutes after the murder, and both were wearing gray hooded sweatshirts. Based on what he saw on the security video, Cunningham compiled a photographic lineup that included a picture of Eddie Jackson and a second lineup that included defendant.

Detective Cunningham executed a search warrant at Eddie Jackson's house on May 21, 2002, where he recovered, among other things, a gray hooded sweatshirt. Cunningham also executed a search warrant at the home of Lashira Jackson, defendant's niece and Eddie Jackson's sister. At her house, officers recovered a .38 Special chrome revolver with a brown wooden handle. The parties stipulated that Cunningham found the gun in Lashira Jackson's house on June 10, 2002, and defendant admitted to Cunningham that he had put the gun there.

At trial, Ernest Brown testified that he knew both defendant and Eddie Jackson prior to the murder. Both men lived in his neighborhood. At the time of the shooting, Brown was at the front service counter talking to a fellow employee. Randazzo was in the dining area preparing to close the restaurant for the night. A man walked in, pointed a gun toward the cash register, and said, "Open the register." The gunman then pointed his weapon at Randazzo and told him to open the cash register. When Randazzo moved to hand the perpetrator the keys, the man shot him in the head. Brown testified that he is positive defendant was the shooter. He could not identify defendant by his face, but recognized his voice.

Ashley Smith testified that Burger King employee Donnie McCoy is the father of her sister's child. On the night of the murder, while McCoy was working, Smith and her sister drove to the restaurant to bring him cigarettes. Smith sat in the car in the parking lot while her sister went inside. While she was waiting, Smith saw two men walk toward the restaurant and then go behind the building to the dumpster area. She testified she was there for 15-20 minutes, but did not see the men exit the area.

Smith testified that when she learned about the murder at Burger King, she told police about the men she had seen. Detective Cunningham testified that Smith said one of the men wore a gray hooded sweatshirt. On January 2, 2002, Cunningham showed Smith a photographic lineup that included a picture of Eddie Jackson, but Smith did not identify anyone from that lineup. Cunningham also showed Smith a lineup with defendant's photograph. She picked out defendant's picture, along with one other, and told the detective that one of her two selections was one of the men she had seen in the

parking lot.  Smith testified that she recognized defendant as one of the men she had seen before the murder, but she picked an extra photograph because she was afraid to identify the perpetrator.

After Smith viewed the photographic lineup, she took McCoy to Burger King to pick up his check and saw the two men that she had seen on the night of the murder.  One of them was named Eddie, and the other was wearing a gray sweatshirt that she recognized from the night of the murder.  She went back to the police station and told Cunningham she could positively identify defendant as one of the men she had seen before the murder.  She also identified defendant in court.

Roxanne Molinary testified that she was working at a CC's Coffee Shop across the parking lot from Burger King on the night of the murder.  Fifteen minutes before she closed the shop for the night, Molinary saw two young men approach the King drive-through window on foot.  One of the men was wearing a gray sweatshirt with the hood pulled up and dark pants.  The other was wearing a dark jacket and light colored pants.  When CC's closed at 10:00 p.m., Molinary began performing cleanup duties.  She took some garbage outside and saw two young men dressed like the ones she had seen earlier, running through the parking lot.  Five to six minutes later, police arrived at Burger King.  Molinary testified she could not see the men's faces.  Police showed her photographic lineups, but she was unable to make an identification.

Andrea Andrews testified that at 10:00 p.m. on December 26, 2001, she was shopping at the Sav-A-Center store adjacent to the Burger King.  She saw a man talking on a cellular telephone.  The man left the store at the same time Andrews did, and he met a second man at the front entrance.  While Andrews was putting her purchases in her car, the two men walked past her, heading directly toward Burger King.  One of them had a bandanna around his neck.  Andrews thought they looked suspicious.  Andrews stopped briefly at a nearby drug store.  When she exited the store, several police vehicles were heading toward Burger King.

Andrews came forward as a witness when she saw news reports about the case.  When Cunningham showed Andrews a photographic lineup, she identified defendant as the man she had seen waiting at the Sav-A-Center entrance.  She wrote on the back of the lineup that she was 75% certain of her choice.[11]

---

[11] <u>Taylor</u>, 973 So.2d at 87-90; State Rec., Vol. VII of XVII.

<u>Denial of Motion To Recuse</u>

Petitioner's first claim is that the trial court erred in denying the motion to recuse the

judge.  The Louisiana Fifth Circuit Court of Appeal denied that claim on direct appeal, holding:

>    In his first assignment of error, defendant contends that the trial judge erred in failing to recuse himself from this case.  The State responds that the motion to recuse was properly denied, because the record shows no bias or prejudice on the judge's part.
>    On December 7, 2004, defendant filed a motion to recuse Judge Hans Liljeberg based on his acquaintance with the murder victim, and because the judge had witnessed an incident in which defendant physically attacked his court-appointed counsel in open court.  The trial court took up defendant's motion to recuse on December 15, 2004.  Judge Liljeberg explained he had been recently reminded that he had attended high school with the murder victim, Benny Randazzo.  The judge recalled that Randazzo was a couple of years behind him in school, he did not know him well, and he had not seen him since high school.
>    Defense counsel then raised the issue of defendant's physical altercation with his previous attorney in court on November 30, 2004. The minute entry for that day shows the case was set for trial, and the parties were in the courtroom.  Defendant physically attacked his attorney, William Doyle.  The trial was continued, and the court appointed another attorney to represent defendant.
>    Defense counsel argued the attack could result in criminal charges and because Judge Liljeberg was present during the altercation, he could be called to testify against defendant.  Judge Liljeberg declined to recuse himself.  The judge stated, "[I]f I thought that I was biased or prejudice [sic], I would honestly recuse myself.... I can give Mr. Taylor a fair trial."  Judge Liljeberg ordered that the recusal motion be randomly allotted to another judge for a contradictory hearing.
>    A hearing on defendant's motion was held on January 6, 2005 before Judge Greg Guidry.  During his testimony, Judge Liljeberg stated that the court was preparing for defendant's trial on November 30, 2004, and the parties were in the courtroom waiting for the jury venire.  Defendant, who was unshackled, had asked the judge to appoint him new counsel, as he was dissatisfied with his attorney, Mr. Doyle.  He also moved for a continuance.  The judge denied both requests. Defendant began chasing Mr. Doyle around the courtroom.

Doyle fell, and defendant jumped on him and began hitting him.  The jailers and the court's bailiff broke up the fight.  Judge Liljeberg testified that no one from the sheriff's office or the district attorney's office had questioned him about the incident.

On cross-examination by the State, the judge testified that he was not a witness in defendant's murder case.  When the prosecutor asked whether the judge and Randazzo had been acquaintances, and the judge responded, "I wouldn't even say that."  When asked whether having attended high school with the victim would cause him to be biased or prejudiced against defendant, the judge said, "Absolutely not."

After hearing arguments from counsel, Judge Guidry denied the recusal motion, finding that the evidence presented was insufficient "to establish that the Judge would be biased, prejudiced or personally interested to such an extent that he would be unable to conduct a fair and impartial trial."  Defendant applied for supervisory writs to this Court, but his writ application was denied on April 22, 2005.  The Louisiana Supreme Court denied writs as well.  State v. Taylor, 05-1227 (La. 5/18/05), 902 So.2d 1034.  Defendant filed a second motion to recuse in the trial court on June 10, 2005, making essentially the same claims he made in his first motion, but Judge Liljeberg denied that motion on June 16, 2005.

LSA-C.Cr.P. art. 671 specifies the grounds upon which a judge may be recused in a criminal case. The pertinent subparts of that article provide:

> A. In a criminal case a judge of any court, trial or appellate, shall be recused when he:
>
> (1) Is biased, prejudiced, or personally interested in the cause to such an extent that he would be unable to conduct a fair and impartial trial;
>
> ....
>
> (6) Would be unable, for any other reason, to conduct a fair and impartial trial.

Canon 2B of the Louisiana Code of Judicial Conduct provides, in pertinent part, that "[a] judge shall not allow family, social, political, or other relationships to influence judicial conduct or judgment."  Canon 3C of that code provides:

Recusation. A judge should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned and shall disqualify himself or herself in a proceeding in which disqualification is required by law or applicable Supreme Court rule. In all other instances, a judge should not recuse himself or herself.

A trial judge is presumed to be impartial, and the burden is on the party seeking to recuse a judge to prove otherwise. State v. Strickland, 04-843, p. 11 (La. App. 5 Cir. 3/1/05), 900 So.2d 885, 893, writ denied, 05-0820 (La. 6/17/05), 904 So.2d 683. The grounds for recusal based on bias or prejudice must amount to more than conclusory allegations. State v. Galliano, 05-962, p. 41 (La. App. 5 Cir. 8/29/06), 945 So.2d 701, 727-28, writ denied, 06-2367 (La. 4/27/07), 955 So.2d 682.

In the present case, defendant has failed to meet his burden of proving bias or prejudice of the judge, or even the appearance of impropriety. Defendant's argument consists of unsupported, conclusory allegations. There was no real social connection between Judge Liljeberg and Mr. Randazzo. The judge testified he barely knew the victim, and that he had not seen him since high school. As to the fact that the judge was a potential witness against defendant, the judge testified that it would have absolutely no influence on his ability to impartially preside over the murder case. Further, although LSA-C.E. art. 605 provides, "[t]he judge presiding at the trial may not testify in that trial as a witness," Judge Liljeberg was not a witness against defendant in the murder prosecution. Moreover, without a specific showing of bias or prejudice, the fact that a defendant behaved improperly in the judge's presence is not sufficient grounds for recusal.

Defendant has not pointed to any evidence in the trial record that demonstrates the trial judge was biased or prejudiced against defendant. Thus, we find no error in the denial of defendant's motion to recuse, and this assignment of error is without merit.[12]

---

[12] Taylor, 973 So.2d at 90-92; State Rec., Vol. VII of XVII.

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[13]

As an initial matter, the Court notes that petitioner cites only state law in his argument.  The requirements of state law are irrelevant in this federal proceeding.  Even if state law had been violated, that fact alone would be of no moment here.  Federal *habeas corpus* relief may be granted only to remedy violations of the *federal* Constitution and laws of the United States; mere violations of *state* law will not suffice.  28 U.S.C. § 2254; Engle v. Isaac, 456 U.S. 107, 119 (1983).  A federal court simply does not have jurisdiction to determine petitioner's rights under "state recusal statutes or ethical canons as such."  Richardson v. Quarterman, 537 F.3d 466, 474 (5th Cir. 2008).

Further, petitioner clearly has not shown that the denial of the recusal motion violated federal law.  Regarding claims of judicial bias, the United States Fifth Circuit Court of Appeals has noted:

> Defendants in the American judicial system have the right to a fair trial, and part of this right is fulfilled by a judicial officer who impartially presides over the trial.  However, most questions concerning a judge's qualifications to hear a case are not constitutional ones, because the Due Process Clause of the Fourteenth Amendment establishes a constitutional floor, not a uniform standard.  A judge will, however, violate a defendant's due process rights if he is biased against the defendant or has an interest in the outcome of the case.  A likelihood or appearance of bias can disqualify a judge as well.  A criminal defendant tried by a partial judge is entitled to have his conviction set aside, no matter how strong the evidence against him.
> Bias is a difficult claim to sustain under AEDPA because the Supreme Court's case law on bias has acknowledged that what degree or kind of interest is sufficient to disqualify a judge from

---

[13] State v. Taylor, 980 So.2d 688 (La. 2008) (No. 2007-K-2454); State Rec., Vol. VII of XVII.

sitting cannot be defined with precision.  Generally, the Supreme Court has recognized two kinds of judicial bias:  actual bias and presumptive bias.

Almost every bias case before the Supreme Court that has found a due process violation has done so based on presumptive bias.  There are three situations in which the Supreme Court has found presumptive bias:

> (1) the decision maker has a direct personal, substantial, and pecuniary interest in the outcome of the case; (2) an adjudicator has been the target of personal abuse or criticism from the party before him; and (3) a judicial or quasi judicial decision maker has the dual role of investigating and adjudicating disputes and complaints.

Buntion v. Quarterman, 524 F.3d 664, 672 (5th Cir. 2008) (citations, quotation marks, and brackets omitted).  In light of the standards of review imposed by 28 U.S.C. § 2254(d)(1), it is important to note that "it is only *clearly established* by Supreme Court precedent that presumptive bias exists in the three circumstances discussed above."  Richardson, 537 F.3d at 476.

Petitioner's allegations against the trial judge in the instant case do not involve any of those three bases for presumptive bias.  The United States Fifth Circuit Court of Appeals has held that bias is not presumed even when a petitioner physically attacks the judge himself, Bigby v. Dretke, 402 F.3d 551, 560 (5th Cir. 2005); therefore, obviously the fact that the trial judge here simply witnessed an attack on another person does not qualify.  Moreover, a judge is not biased merely because he had a passing acquaintance with the victim.  United States *ex rel.* Perry v. Cuyler, 584 F.2d 644, 647 (3rd Cir. 1978) (the fact that the judge was acquainted with the murder victim "in and of itself would not indicate that [the judge] had a substantial interest in petitioner's conviction or sentence").

In that petitioner's allegations do not involve any of the established bases for presumptive bias, this Court need determine only whether petitioner has proven actual bias in this case.  See Buntion, 524 F.3d at 673.  He has not.  He has no presented evidence of actual bias, and the record does not reflect any circumstances from which such bias could even be reasonably inferred.  Because petitioner's allegations are purely speculative and conclusory, he cannot overcome the presumption of the judge's honesty and integrity.  Therefore, the state court's finding that petitioner failed to meet his burden of proof is reasonable.

In summary, petitioner has failed to demonstrate that the state court's decision denying his claim was contrary to, or involved an unreasonable application of, clearly established federal law.  Accordingly, the AEDPA requires this Court to likewise reject the claim.

<u>Hearsay</u>

Petitioner next claims that the trial court erred in admitting hearsay testimony.  On direct appeal, the Louisiana Fifth Circuit Court of Appeal rejected that claim, holding:

> [D]efendant contends that the trial court erred in admitting hearsay evidence through the testimony of police officers.  He complains he was denied his right of confrontation when the trial court allowed the State to elicit hearsay testimony from Officer Seals and Detective Cunningham over his objections.  The State respond that the officers' testimony did not constitute hearsay, since it was admitted to show why the officers took the actions they did to identify a suspect.
>      The Sixth Amendment to the United States Constitution guarantees an accused in a criminal prosecution the right to be confronted with the witnesses against him.  Similarly, the confrontation clause of the Louisiana Constitution expressly guarantees the accused the right "to confront and cross-examine the witnesses against him."  LSA-Const. art. I, § 16; State v. Weaver, 05-169, p. 13 (La. App. 5 Cir. 11/29/05), 917 So.2d 600, 609, writ denied, 06-0695 (La. 12/15/06), 944 So.2d 1277.  The primary

purpose of confrontation rights is to secure for the defendant the opportunity of cross-examination.  Id.

Hearsay is an oral or written assertion, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. LSA-C.E. art. 801 C.  Hearsay evidence is not admissible except as otherwise provided by the Code of Evidence or other legislation. LSA-C.E. art. 802; State v. Leonard, 05-42, p. 14 (La. App. 5 Cir. 7/26/05), 910 So.2d 977, 986, writ denied, 06-2241 (La. 6/1/07), 957 So.2d 165.

Officer Keith Seals, one of the first police officers to arrive at the murder scene, testified that he spoke to Lenell Jackson, a witness to the shooting.  Seals said he was told that the shooter wore a gray, hooded sweatshirt and blue jeans.  At that point, defense counsel objected to the testimony on hearsay grounds.  The prosecutor responded that witnesses' descriptions are considered non-hearsay under LSA-C.E. art. 801 D(1), which provides that a statement is not considered hearsay if "[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is: ... [o]ne of identification of a person made after perceiving the person."

The trial court overruled the objection, and allowed the State to elicit further testimony from Seals about what the perpetrator looked liked.  Defendant made another hearsay objection, which the court overruled.  The judge noted defense counsel's continuing objection.  Seals then testified that he spoke to the other Burger King employees who had witnessed the murder, and that they essentially repeated what Ms. Jackson had told him.

Detective Cunningham testified that he interviewed witnesses Jessica White, Ernest Brown, Donnie McCoy, and Lenell Jackson. When the detective began to testify regarding Ernest Brown's description of the shooter, defense counsel made a hearsay objection. The court overruled the objection, reasoning the testimony was not hearsay because the State was not using it to prove the truth of the matter asserted, but to show why the officer acted as he did in his efforts to arrive at a suspect in the murder case.  When Cunningham testified to what the restaurant's manager, Judy Jacobsen, told him, the defense made another hearsay objection.  The trial court overruled the objection because Jacobsen had already testified at trial and was subject to cross-examination.  The State went on to elicit testimony from Cunningham about what he was told by defendant's

nephew, Eddie Jackson; Burger King employee, David Reese; Lenell Jackson, Ashley Smith, and Andrea Andrews.

A police officer, in explaining his own actions, may refer to statements made to him by other persons involved in the case.  State v. Dyer, 00-1866, p. 14 (La. App. 5 Cir. 4/24/01), 794 So.2d 1, 12, writ denied, 01-1579 (La. 6/27/03), 847 So.2d 1256.  Such statements are admitted not to prove the truth of the matter asserted, but to explain the sequence of events leading to the arrest of the defendant from the viewpoint of the officer.  Id.  In State v. Broadway, 96-2659, pp. 7-8 (La. 10/19/99), 753 So.2d 801, 808, cert. denied, 529 U.S. 1056, 120 S.Ct. 1562, 146 L.Ed.2d 466 (2000), the Louisiana Supreme Court commented on the admissibility of information received by a police officer:

> When an out-of-court statement, such as information received by a police officer during an investigation of a crime, has both an impermissible hearsay aspect and a permissible nonhearsay aspect, the issue of relevancy becomes significantly interrelated with the hearsay issue.  If the nonhearsay content of the statement has little or no relevance, then the statement should generally be excluded on both relevance and hearsay grounds.  Marginally relevant nonhearsay evidence should not be used as a vehicle to permit the introduction of highly relevant and highly prejudicial hearsay evidence which consists of the substance of an out-of-court assertion that was not made under oath and is not subject to cross-examination at trial.

In the present case, much of the testimony at issue was clearly admissible.  The officers' testimony about what they were told by witnesses Ernest Brown, Ashley Smith, Andrea Andrews, and Judy Jacobsen was not hearsay, because those declarants testified at trial and were subject to cross-examination.

David Reese, Lenell Jackson, and Eddie Jackson did not testify at trial, and none of them were ever subject to cross-examination by defendant.  However, our review reveals that much of the officers' testimony regarding these witnesses' statements was admissible to show how the officers came to arrest defendant and charge him with Benny Randazzo's murder.  Although some of the testimony constituted inadmissible hearsay, the error in allowing this testimony was harmless.[FN4]   Defense counsel extensively

cross-examined Officer Seals and Detective Cunningham, and he had the officers repeat much of the same testimony the State elicited.  See State v. Cho, 02-274, p. 18 (La. App. 5 Cir. 10/29/02), 831 So.2d 433, 447-48, writ denied, 02-2874 (La. 4/4/03), 840 So.2d 1213.  He cannot now complain that such testimony is inadmissible.  Moreover, there was considerable other evidence to support defendant's conviction, and the guilty verdict was surely unattributable to any error in allowing this testimony.  Accordingly, this assignment of error is without merit.

> [FN4]  Confrontation errors are subject to harmless error analysis and the verdict may stand if the reviewing court determines that the guilty verdict is surely unattributable to the error.  Sullivan v. Louisiana, 508 U.St. 275, 279, 113 S.Ct. 2078, 2081-82, 124 L.Ed.2d 182 (1993); State v. Everidge, 96-2665, p. 8 (La. 12/2/97), 702 So.2d 680, 685; State v. Davis, 05-987, p. 15 (La. App. 5 Cir. 5/9/06), 930 So.2d 1099, 1107.[14]

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[15]

It is not the role of this Court to second-guess the state court's interpretation and application of state law regarding hearsay evidence.  Simply put, "[i]n habeas actions, [a federal court] does not sit to review the mere admissibility of evidence under state law."  Little v. Johnson, 162 F.3d 855, 862 (5th Cir. 1998).  Therefore, to the extent that petitioner is arguing that the state courts misapplied state law regarding hearsay evidence, his claim is not reviewable in this federal proceeding.

---

[14] Taylor, 973 So.2d at 97-99; State Rec., Vol. VII of XVII.

[15] State v. Taylor, 980 So.2d 688 (La. 2008) (No. 2007-K-2454); State Rec., Vol. VII of XVII.

That, however, does not end the matter, because, as noted by the state court, petitioner's claim also clearly implicates petitioner's rights under the federal Confrontation Clause. "Although the protections of the Confrontation Clause and the hearsay rule overlap, they are not co-extensive ...." Gochicoa v. Johnson, 118 F.3d 440, 446 (5th Cir. 1997). The United States Supreme Court has in recent years examined in great detail the protections afforded by the federal Confrontation Clause. The Supreme Court explained:

>The Confrontation Clause of the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." In Crawford v. Washington, 541 U.S. 36, 53-54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), we held that this provision bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." A critical portion of this holding ... is the phrase "testimonial statements." Only statements of this sort cause the declarant to be a "witness" within the meaning of the Confrontation Clause. See id., at 51, 124 S.Ct. 1354. It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause.

Davis v. Washington, 547 U.S. 813, 821 (2006). The Supreme Court continued:

>Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

Id. at 822.

In the instant case, the statements at issue were clearly made after the emergency had passed and were obviously elicited for the purpose of establishing facts for a later criminal prosecution. Therefore, they were testimonial in nature, and, as such, the admission of the statements by the non-testifying witnesses did in fact violate the Confrontation Clause.

Nevertheless, as noted, the state court found that relief was not warranted because the admission of those statements was ultimately harmless. This Court agrees. The United States Fifth Circuit Court of Appeals has held:

> [V]iolations of the Confrontation Clause are still subject to harmless error analysis. ... To determine whether the error was harmless, we consider the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and of course, the overall strength of the prosecution's case.

Hafdahl v. Johnson, 251 F.3d 528, 539-40 (5th Cir. 2001) (quotation marks omitted). In the instant case, there was substantial evidence of petitioner's guilt. Specifically, he was identified by multiple eyewitnesses who testified at trial and were subject to cross-examination. Moreover, the problematic statements of the non-testifying witnesses were merely cumulative and did not appreciably enhance the strength of the case against petitioner. Therefore, the admission of those statements simply did not have "a substantial and injurious effect or influence in determining the jury's verdict." Taylor v. Cain, 545 F.3d 327, 336 (5th Cir. 2008) (quoting Brecht v. Abrahamson, 507 U.S. 619, 623 (1993)). Accordingly, the trial court's error was harmless and does not warrant federal relief.

In summary, the Court finds that petitioner has failed to demonstrate that the state court's decision rejecting his Confrontation Clause claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  Applying the AEDPA's deferential standard, this Court likewise rejects that claim.

<u>Appeal/Judicial Review</u>

Petitioner next claims that he was denied his right to appeal and judicial review.  In the last reasoned opinion addressing that claim, the Louisiana Fifth Circuit Court of Appeal denied relief, holding:

> Relator argued in his application that he was denied his right to judicial review because the court reporter was unable to produce the transcript of June 27, 2005 for his appeal.  Attached to relator's writ is a copy of the June 27, 2005 transcript, which shows a filing date of April 16, 2007.  On April 19, 2007, this Court denied relator's motion to summarily reverse unlodged appeal for failure to produce transcripts because the transcript was filed on April 16, 2007.  The records of this court reflect that defendant's appellate brief was filed on May 14, 2007.  Therefore, it appears that defendant's appellate counsel was able to review the June 27, 2005 transcript prior to filing the brief.  As such, relator has failed to meet his burden of proof under LSA-C.Cr.P. art. 930.2 and this claim lacks merit.[16]

Petitioner was then likewise denied relief by the Louisiana Supreme Court without additional reasons assigned.[17]

---

[16] <u>Taylor</u>, No. 09-KH-891, at pp. 3-4; State Rec., Vol. VI of XVII.

[17] <u>State <i>ex rel.</i> Taylor v. State</u>, 53 So.3d 469 (La. 2011) (No. 2010-KH-0149); State Rec., Vol. XVII of XVII.

Although petitioner disputes the state court's conclusions on this point, he presents no evidence clearly establishing that the June 27 transcript was not in fact filed with that court and reviewed by his counsel prior to the filing of her brief.  Moreover, the state court record supports the court's conclusions.  A copy of the transcript appears in the record accompanied by a cover sheet indicating that it was filed with the Court of Appeal as a supplement to the record on April 18, 2007.[18]  Further, as the state notes in its answer in this proceeding, appellate counsel even cited to that supplemental volume of the record in her subsequently filed brief.[19]  Because the factual allegation on which this claim is based, i.e. that the transcript was unavailable and unreviewed by counsel, has not been established, the claim necessarily fails because petitioner has not met his burden of proof.[20]

Petitioner simply has not shown that the state court's decision rejecting this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  Accordingly, under the deferential standards of review mandated by the AEDPA, the claim should likewise be denied by this Court.

---

[18] State Rec., Vol. XIV of XVII.

[19] State Rec., Vol. XIII of XVII, Original Brief of Appellant, p. 6.

[20] In any event, even if petitioner were able to prove that the transcript was unavailable to counsel, he has not explained how that affected the fairness of the state proceedings and the ultimate validity of his conviction.  The transcript of the hearing appears in Volume XIV of the state court record and has been reviewed by this Court.  Little of significance occurred at that hearing which dealt primarily with the granting of a continuance.  Petitioner has not identified any viable additional claims which could have been raised on appeal based on that transcript, and this Court sees none.

Ineffective Assistance of Counsel

Lastly, petitioner claims that he received ineffective assistance of counsel both at trial and on appeal.  The United States Supreme Court established a two-prong test for evaluating claims of ineffective assistance of counsel.  A petitioner seeking relief must demonstrate that counsel's performance was deficient *and* that the deficient performance prejudiced his defense.  Strickland v. Washington, 466 U.S. 668, 697 (1984).  Petitioner bears the burden of proof on such a claim and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective." Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000).  If a court finds that petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong.  Strickland, 466 U.S. at 697.

To prevail on the deficiency prong of the Strickland test, petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment.  See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001).  "Counsel's performance is deficient if it falls below an objective standard of reasonableness." Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998).  Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances.  See Strickland, 466 U.S. at 689.  "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'"  Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690).  Petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.  See Crockett v.

McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

　　　　The appropriate standard for determining prejudice varies slightly depending on whether a petitioner is challenging the actions of trial or appellate counsel.  In order to prove prejudice with respect to *trial* counsel, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.  In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.  In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial."  Crockett, 796 F.2d at 793.  On the other hand, to prove prejudice with respect to a claim that *appellate* counsel was ineffective, a petitioner must show a reasonable probability that he would have prevailed on appeal but for his counsel's deficient representation.  Briseno v. Cockrell, 274 F.3d 204, 207 (5th Cir. 2001); see also Smith v. Robbins, 528 U.S. 259, 286 (2000).  Therefore, a petitioner must demonstrate a reasonable probability that, if appellate counsel's performance had not been deficient in the manner claimed, the appellate court would have vacated or reversed the trial court judgment based on the alleged error.  Briseno, 274 F.3d at 210.

　　　　Petitioner's ineffective assistance of counsel claims were rejected by the state courts in the post-conviction proceedings.  Because such claims present mixed questions of law and fact, this Court must defer to the state court decision rejecting the claims unless that decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Moore v. Cockrell,

313 F.3d 880, 881 (5th Cir. 2002). Moreover, the United States Supreme Court recently explained

that, under the AEDPA, federal *habeas corpus* review of ineffective assistance of counsel claims

is in fact *doubly* deferential:

> The pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.
>
> A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision. Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." Ibid. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." Knowles v. Mirzayance, 556 U.S. ____, ____, 129 S.Ct. 1411, 1413-14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).

Harrington v. Richter, 131 S.Ct. 770, 785-86 (2011) (citation omitted). The Supreme Court then

explained:

> Surmounting Strickland's high bar is never an easy task. An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest

intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.

Establishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult. *The standards created by <u>Strickland</u> and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.* The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d). *When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.*

<u>Id</u>. at 788 (citations omitted; emphasis added). For the following reasons, the Court finds that, under these stringently deferential standards, it simply cannot be said that relief is warranted in the instant case with respect to petitioner's ineffective assistance of counsel claims.

The last reasoned opinion to address petitioner's ineffective assistance claims is that of the Louisiana Fifth Circuit Court of Appeal in the post-conviction proceedings.[21] That court first correctly summarized the general law applicable to such claims, noting:

Under the Sixth Amendment to the United States Constitution and Article I, § 13 of the Louisiana Constitution, a defendant is entitled

_____

[21] The Louisiana Supreme Court thereafter also reviewed petitioner's claims but denied them without assigning additional reasons. <u>State *ex rel.* Taylor v. State</u>, 53 So.3d 469 (La. 2011) (No. 2010-KH-0149); State Rec., Vol. XVII of XVII.

to effective assistance of counsel.  State v. McDonald, 04-550, p. 5 (La. App. 5 Cir. 11/16/04), 889 So.2d 1042, writ denied, 04-3088 (La. 4/1/05), 897 So.2d 599.  A claim of ineffective assistance of counsel must satisfy the two-prong test set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2025, 80 L.Ed.2d 674 (1984). State v. Dabney, 05-53, p. 4 (La. App. 5 Cir. 6/28/05), 908 So.2d 60, 63.  Under the Strickland test, the defendant must show:  (1) that counsel's performance was deficient, that is, that the performance fell below an objective standard of reasonableness under prevailing professional norms; and (2) that the deficient performance prejudiced the defense.  State v. Dabney, 05-53 at 4, 908 So.2d at 63, citing, Strickland v. Washington, 466 U.S. at 687, 104 S.Ct. at 2064.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Id.  The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  State v. Dabney, 05-53 at 4, 908 So.2d at 63, citing, Strickland v. Washington, 466 U.S. at 694, 104 S.Ct. at 2068.[22]

The Court of Appeal then addressed each of petitioner's three ineffective assistance

claims.  As to the first claim, the Court of Appeal held:

> Relator argued in his application that his appellate counsel was ineffective for failing to raise a claim of insufficiency of the evidence on appeal.  He contends there was no evidence to prove specific intent.  This Court's appellate opinion reflects that relator's appellate counsel raised eight assignments of error on appeal:  (1) the trial court erred in failing to recuse himself; (2) the State violated Brady/Giglio by failing to disclose evidence regarding State witness Ernest Brown; (3) the State violated the discovery rules by failing to disclose evidence regarding State witness Roxanne Molinary; (4) the trial court erred in limiting the defense voir dire examination; (5) the trial court erred in admitting hearsay evidence through the police officers' testimony; (6) the trial court erred in admitting evidence of other crimes when it ruled a letter was admissible; (7) the trial court erred when it failed to suppress the gun seized at his niece's home,

---

[22] Taylor, No. 09-KH-891, at p. 4; State Rec., Vol. VI of XXVII.

because it was shown that it could not have been the actual murder weapon; and (8) the State made an improper closing argument.  State v. Taylor, 07-93 (La. App. 5 Cir. 11/27/07), 973 So.2d 83, writ denied, 07-2454 (La. 5/9/08), 980 So.2d 688.

This Court's opinion reflects that relator's appellate counsel thoroughly researched the record and the pertinent jurisprudence and addressed numerous assignments of error she thought were non-frivolous.  Additionally, this Court, as it usually does, conducted an errors patent review, and found none that required corrective action.

Relator was convicted of the second degree murder of Benny Randazzo, the assistant manager at a Burger King Restaurant.  At trial, Ernest Brown testified that a man walked into the resaturant, pointed a gun toward the cash register, and said, "Open the register." The gunman then pointed his weapon at Randazzo and told him to open the cash register.  When Randazzo moved to hand the perpetrator the keys, the man shot him in the head.  Brown testified that he was positive relator was the shooter.  Although Brown could not identify relator by his face, he recognized his voice.  State v. Taylor, 07-93 at 6, 973 So.2d at 89.  Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person.  State v. Hoffman, 98-3118, p. 48 (La. 4/11/00), 768 So.2d 542, 585, opinion supplemented, 00-1609 (La. 6/14/00), 768 So.2d 592, cert. denied, 531 U.S. 946, 121 S.Ct. 345, 148 L.Ed.2d 277 (2000).  Deliberately pointing and firing a deadly weapon at close range are circumstances which will support a finding of specific intent to kill.  State v. Batiste, 06-869, p. 6 (La. App. 5 Cir. 4/11/07), 958 So.2d 24, 27.

In light of the foregoing, relator has failed to satisfy either prong of the Strickland test or meet his burden that relief should be granted under LSA-C.Cr.P. art. 930.2.[23]

As the state court noted, this claim clearly has no merit.  As an initial matter, it must be remembered that "[c]ounsel is not obligated to urge on appeal every nonfrivolous issue that might be raised (not even those requested by defendant)."  West v. Johnson, 92 F.3d 1385, 1396 (5th Cir. 1996).  On the contrary, "[e]xperienced advocates since time beyond memory have emphasized the

---

[23] Taylor, No. 09-KH-891, at pp. 5-6 (footnotes omitted); State Rec., Vol. VI of XVII.

importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." Jones v. Barnes, 463 U.S. 745, 751-52 (1983).  Far from evidencing ineffectiveness, an appellant counsel's restraint often benefits his client because "a brief that raises every colorable issue runs the risk of burying good arguments . . . in a verbal mound made up of strong and weak contentions." Id. at 753.  Therefore, "[g]enerally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." Diaz v. Quarterman, 228 Fed. App'x 417, 427 (5th Cir. 2007) (quotation marks omitted).  That is not the case here.  Further, it is evident that petitioner suffered no prejudice as result of counsel's decision, because, even if such a claim had been asserted on appeal, it would have been rejected in light of the fact that the evidence was clearly sufficient to support the verdict.

As to petitioner's second ineffective assistance claim, the Louisiana Fifth Circuit Court of Appeal held:

> Relator argued in his application that his appellate counsel was ineffective because the court reporter failed to produce the complete record, i.e., the June 27, 2005 transcript.  However, as we stated under Claim #1, the transcript was ultimately filed into the record, and appellate counsel had time to review it prior to filing her brief.  As such, relator has failed to satisfy either prong of the Strickland test or meet his burden under LSA-C.Cr.P. art. 930.2 that relief should be granted.[24]

Because the factual allegation on which this claim is based, i.e. that the transcript was unavailable and unreviewed by counsel, has not been established, this claim necessarily fails because petitioner has not met his burden of proof.  Further, as previously noted, even if petitioner could prove that the

---

[24] Taylor, No. 09-KH-891, at p. 6; State Rec., Vol. VI of XVII.

transcript was unavailable to counsel, petitioner has not identified any viable additional claims which could have been raised on appeal based on that transcript, and none are apparent to this Court from its review of that transcript. Therefore, he has not established the required prejudice necessary to support an ineffective assistance claim.

As to petitioner's remaining ineffective assistance claim, the Court of Appeal held:

Relator argued in his application that his trial counsel was ineffective for failing to file a motion for post-verdict judgment of acquittal. He contended that it was trial counsel's duty to file one since the evidence was insufficient to prove beyond a reasonable doubt that he had the specific intent to kill the victim.

Relator's trial counsel apparently did not believe that a motion for post-verdict judgment of acquittal was warranted based on the evidence. In order to prevail, the accused must overcome a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; specifically, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." Strickland v. Washington, 466 U.S. at 689, 104 S.Ct. at 2065. An alleged error that is within the ambit of trial strategy does not establish ineffective assistance of counsel, because "opinions may differ on the advisability of such a tactic." State v. Singleton, 05-634, p. 11, (La. App. 5 Cir. 2/14/06), 923 So.2d 803, 811, writs denied, 06-1208 (La. 11/17/06), 942 So.2d 532, and 08-2386 (La. 1/30/09), 999 So.2d 753.

Additionally, the failure to challenge sufficiency by post-trial motion does not preclude appellate review of sufficiency of the evidence. State v. Rivet, 01-353, p. 10 (La. App. 5 Cir. 9/25/01), 798 So.2d 219, 226, citing, State v. Washington, 421 So.2d 887, 889 (La. 1982). Therefore, the failure to file such a motion is not ineffective assistance of counsel, because defendant suffers no prejudice. See State v. Noil, 01-521, p. 27 (La. App. 5 Cir. 12/26/01), 807 So.2d 295, 314, writ denied, 02-0276 (La. 10/25/02), 827 So.2d 1177.

In light of the foregoing analysis we find that relator has failed to satisfy either prong of the Strickland test or meet his burden

under LSA-C.Cr.P. art. 930.2, therefore the relief requested is denied.[25]

This claim warrants little consideration in this federal proceeding.  It is clear that counsel is not ineffective for failing to file a post-verdict motion for judgment of acquittal where, as here, there was sufficient evidence to support the verdict   Wiltz v. Louisiana, No. 04-30017, 1994 WL 286254, at *5 (5th Cir. June 22, 1994); Page v. Rader, Civ. Action No. 10-1724, 2011 WL 1226477, at *6-7 (E.D. La. Mar. 14, 2011), adopted, 2011 WL 1213169 (E.D. La. Mar. 29, 2011); Wilson v. Cain, Civ. Action No. 06-890, 2009 WL 2163124, at *26 (E.D. La. 2009), aff'd, 641 F.3d 96 (2011); Nicks v. Cain, Civ. Action No. 04-0519, 2005 WL 1578024, at *13 (E.D. La. June 30, 2005).

For all of these reasons, the Court finds that petitioner has failed to demonstrate that the state court's decision denying his ineffective assistance of counsel claims was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  Accordingly, applying the AEDPA's deferential standard, this Court should likewise reject the claims.

## **RECOMMENDATION**

Accordingly, **IT IS RECOMMENDED** that the petition of **Justin Taylor** for federal habeas corpus relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after

---

[25] Taylor, No. 09-KH-891, at pp. 7-8; State Rec., Vol. VI of XVII.

being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[26]

New Orleans, Louisiana, this twenty-sixth day of July, 2011.

**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**

---

[26] <u>Douglass</u> referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.